IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:24-cr-467-ECM |
| | ) | [WO] |
| KHALFANI AHMED HARDWICK | ) | |

**MEMORANDUM OPINION and ORDER**

## I.  INTRODUCTION

This matter is before the Court on the Government's request to involuntarily medicate Defendant Khalfani Ahmed Hardwick ("Hardwick"), pursuant to *Sell v. United States*, 539 U.S. 166 (2003), so that Hardwick may attain competency to stand trial.   This Court has concluded on several occasions that Hardwick is not competent—i.e., that he "suffers from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequence of the proceedings against him and to assist properly in his defense." 18 U.S.C. § 4241(d); (*see* docs. 36, 52).   Doctors employed by the Federal Bureau of Prisons ("BOP") have undertaken efforts to restore Hardwick to competency, and they have concluded that he is unlikely to become competent unless he takes antipsychotic medication.   However, Hardwick has refused to consistently take antipsychotic medication.   Consequently, the Government has moved to have Hardwick involuntarily medicated so that this case can move forward.

The Court held a hearing on the Government's request on March 4, 2026 (the *Sell* hearing).   Present at the hearing were counsel for the Government, counsel for Hardwick, and the guardian *ad litem* appointed by the Court to represent Hardwick's interests.

Hardwick, who is presently in the custody of the BOP, also attended the hearing via videoconference from the Federal Medical Center at Butner ("FMC Butner").[1]   The Court heard testimony from Dr. JohnRobert Jones ("Dr. Jones"), a forensic psychologist at FMC Butner; Dr. Sara Feizi ("Dr. Feizi"), Staff Psychiatrist at FMC Butner; and Task Force Officer Jason Moore ("TFO Moore"), the case agent in this case.[2]   Additionally, the parties submitted post-hearing briefs addressing whether the Government had met its burden under *Sell* to justify involuntarily medicating Hardwick. (Docs. 69, 71, 73).   After careful consideration, and for the following reasons, the Court finds that the Government has met its burden, and the Court will require that Hardwick be medicated under the protocol set out below in an effort to restore him to competency.

## II.   PROCEDURAL HISTORY AND FACTUAL BACKGROUND

Hardwick is charged in a one-count indictment with possession of a firearm by a convicted felon on or about February 24, 2024, in violation of 18 U.S.C. § 922(g)(1). (Doc. 1).   On February 13, 2025, the Magistrate Judge granted Hardwick's motion for a mental evaluation pursuant to 18 U.S.C. § 4241 to determine whether he is competent to stand trial, and pursuant to § 4242 to determine whether he was sane at the time of the offense. (Doc. 20).   Hardwick was transported to the Federal Medical Center at Ft. Worth ("FMC Ft. Worth") for the competency evaluation.   The evaluation was completed on April 17,

---

[1] Hardwick, through the guardian *ad litem*, waived his personal appearance at the *Sell* hearing, and the Court permitted him to appear virtually. (Doc. 61).

[2] Dr. Jones and Dr. Feizi testified via videoconference by agreement of the parties.

2025, and the BOP's report was submitted to the Court on May 2, 2025. (Doc. 30 at 2). Dr. Lacie L. Biber ("Dr. Biber"), Licensed Psychologist at FMC Ft. Worth, evaluated Hardwick and opined that he appeared to suffer from a mental disease—specifically schizophrenia—which rendered him unable to understand the nature and consequences of these proceedings and properly assist in his defense. (*Id.* at 12).   The BOP did not evaluate Hardwick's sanity at the time of the offense due to the unresolved question about his competency. (*Id.* at 2).

On May 14, 2025, following a status conference during which the parties stipulated to the BOP's findings, the Court entered an Order declaring Hardwick incompetent and committing him to the custody of the Attorney General for no more than four months to attempt restoration, pursuant to 18 U.S.C. § 4241(d). (Doc. 36).   Hardwick arrived at FMC Butner on August 12, 2025; his evaluation concluded on December 10, 2025; and a written forensic evaluation, dated December 17, 2025, was submitted to the Court on December 22, 2025. (*See* doc. 47).   In sum, Dr. Jones, who authored the December 17 evaluation, opined that Hardwick has schizophrenia with significant symptoms of paranoia and remained incompetent to stand trial.   According to the evaluation, Hardwick largely failed to comply with the BOP's prescribed medication regimen, and he also largely refused to participate in clinical interviews (doc. 47 at 7–11) or programming, including the Competency Restoration Group (*id.* at 11).   Dr. Jones opined that there was a substantial probability that Hardwick would attain competency if treated with antipsychotic medication and/or mood stabilizers. (*Id.* at 14).

On January 7, 2026, the Court held a status conference to discuss how to proceed in light of the BOP's December 17 evaluation.   At the status conference, the Government confirmed that it would request a court order for Hardwick to be involuntarily medicated pursuant to *Sell*.   Additionally, defense counsel made an oral motion for the Court to appoint a guardian *ad litem* for Hardwick, which the Court granted.   The parties stipulated to the findings in the BOP's December 17 evaluation that Hardwick remained incompetent to proceed.   On January 12, 2026, the Court entered an Order finding by a preponderance of the evidence that Hardwick was then "suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." (Doc. 52 at 2).   The Court further found that the appointment of a guardian *ad litem* was necessary for adequate representation of Hardwick, and therefore the guardian *ad litem* was entitled to compensation pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A.

On February 20, 2026, the BOP submitted an addendum to Hardwick's forensic evaluation (the "Addendum"), authored by Dr. Feizi. (Doc. 67).   Dr. Feizi opined that, based on research studies, antipsychotic medication restores patients with schizophrenia to competency over 76.5% of the time. (*Id.* at 6).   One study, authored by Cochrane *et al.*, reviewed the treatment outcomes of all defendants involuntarily treated under *Sell* for the entire federal court system between June 2003 and December 2009—a total of 132 individuals. (*Id.*).   In patients diagnosed with schizophrenia, 76.5% (62 out of 81) were restored to competency. (*Id.*).   However, the addendum did not specify whether the

schizophrenia patients who were restored to competency were treated with antipsychotic medication. Another study, authored by Faizi *et al.*, reviewed the effectiveness of antipsychotic medications in restoring competency in individuals with severe mental illness in California's forensic state hospital system, focusing on whether antipsychotic medications improved functional outcomes necessary for competency to stand trial. (*Id.*). Unspecified schizophrenia patients had a restoration rate of 93.2% (655 of 703) with antipsychotic medication. (*Id.*).

Dr. Feizi acknowledged that several factors might limit Hardwick's chances of successfully responding to antipsychotic medication, including (1) his poor insight into his mental illness, (2) the number of years untreated, and (3) his limited history of responding to antipsychotic medication. (*Id.*). However, there are also several positive prognostic factors, including: (1) he is free from negative symptoms of psychosis, which studies have associated with a less robust response to medication; (2) he has no comorbid cognitive disorder, such as intellectual disability, traumatic brain injury, or dementia; and (3) the majority of individuals with chronic psychotic disorders improve to some degree in their mental status following treatment with antipsychotic medication. (*Id.*).

The Addendum also outlined a proposed individualized treatment plan for Hardwick. (*Id.* at 7). Dr. Feizi first recommended the antipsychotic medication Risperdal. She would first offer Hardwick an oral formulation called risperidone, a second-generation antipsychotic medication with a lower side-effect profile. (*Id.*). Risperidone would start at a low dose of 1 to 2 milligrams orally and increase to 3 to 8 milligrams as clinically

5

indicated. (*Id.*).   If Hardwick refused to take oral medications, Dr. Feizi would administer a long-acting injectable formulation of risperidone called Risperdal Consta, which could be given involuntarily by intramuscular injection every 2 weeks, starting at 12.5 milligrams and gradually increased to 50 milligrams as clinically indicated. (*Id.*).   An alternative antipsychotic is an intramuscular injection of paliperidone, which has a benefit over Risperdal of being administered only once per month. (*Id.*).

Although the goal would be to treat Hardwick with "monotherapy antipsychotic" (i.e., a single drug), Dr. Feizi opined that it is possible if one of the above drugs has been maximized or reaches its potential, an additional antipsychotic may be necessary to reduce delusions to a level needed for competency. (*Id.*).   Dr. Feizi recommended haloperidol, which may be combined with risperidone or paliperidone and has an oral form, short-acting injectable form, and long-acting injectable form. (*Id.*).   The injectable form is called Haldol.

Dr. Feizi predicted that treatment will take between four and eight months. (*Id.*). She further opined that "adjunctive treatments" may also be necessary, including medication to manage side effects and/or an additional antipsychotic, mood stabilizer, antidepressant, or antianxiety medication. (*Id.*).

The Addendum also discusses potential side effects of antipsychotic medications and efforts the BOP would undertake to mitigate such side effects. (*Id.* at 8).   All antipsychotics carry the risk of neuromuscular side effects, but Dr. Feizi opined that they are manageable with either additional medication to treat the symptoms, lowering the dose

of the antipsychotic medication, switching the antipsychotic medication, or a combination. (*Id.*).

### III.   TESTIMONY PRESENTED AT THE *SELL* HEARING

At the *Sell* hearing, the Court heard testimony from Dr. Jones and Dr. Feizi, Hardwick's doctors at the BOP, and TFO Moore, the case agent who testified about the circumstances giving rise to Hardwick's indictment in this case.   The Court summarizes their testimonies further below.

### 1.   Dr. Jones

Dr. Jones testified at the *Sell* hearing as follows.   Dr. Jones is a forensic psychologist at FMC Butner.   His duties include conducting § 4141(d) competency restoration evaluations and § 4246 dangerousness evaluations, as well as running group sessions, supervising interns, and conducting crisis interventions.   He holds a bachelor's degree in psychology, master's degrees in forensic psychology and clinical psychology, and a doctoral degree in clinical psychology.   He was offered and accepted as an expert in forensic psychology.

Dr. Jones met Hardwick on August 12, 2025, when Hardwick arrived at FMC Butner for competency restoration treatment.   During their initial meeting, Hardwick's appearance was adequate, he was groomed and taking care of his personal hygiene, he was able to pay attention, and he appeared to understand why he was at FMC Butner. However, he was also guarded and suspicious.   He was deemed appropriate for the general population.

When Hardwick arrived at FMC Butner, Dr. Biber (a psychologist at FMC Ft. Worth) had diagnosed him with schizophrenia. Schizophrenia is a psychotic disorder marked by symptoms such as hallucinations, delusions, disordered speech or behavior, and other negative symptoms such as isolation and poor hygiene. Schizophrenia highly impacts an individual's daily functioning. Dr. Jones subsequently evaluated Hardwick to determine the appropriate diagnosis. This evaluation was a multifaceted procedure which included review of Hardwick's medical records, the prior BOP report, Dr. Jones' observations, talking to other FMC Butner staff who observed Hardwick, psychological testing, and interviews with Hardwick. Dr. Jones attempted multiple times to conduct a background interview with Hardwick, but Hardwick was not willing to participate. However, Dr. Jones obtained background information from the lawyers in the case, Dr. Biber's report, and Hardwick's medical records.

According to the medical records, Hardwick began experiencing symptoms of psychosis in 2013 when he was around 25 years old, which is typical for men. The symptoms impacted his life, and he withdrew from school. He experienced paranoia and nervousness, and his family members were concerned, as evidenced by, for example, an instance in which Hardwick's mother sent him to an inpatient hospital. The records indicate prior instances where Hardwick received medication from a hospital which appeared to help him in the moment, but there are no records indicating whether he took medication in the free world. Additionally, he reported to Dr. Biber in 2025 that he had voices in his head preventing him from sleeping.

8

When Hardwick arrived at FMC Butner, he enrolled in the Competency Restoration Group, a group aimed at providing individuals with factual information about topics such as how the court process works and how to speak to an attorney.   However, Hardwick was not receptive to these interventions, and he attended only three sessions over the course of four months.   Dr. Jones encouraged Hardwick to attend the group sessions, but the efforts were not successful.

Additionally, when Hardwick first arrived, he said he would speak to a psychiatrist, so Dr. Jones set Hardwick up with a psychiatrist to discuss medication.   Hardwick initially agreed to take risperidone, an antipsychotic medication used to treat schizophrenia, but he was not consistent in taking it.   When FMC Butner staff asked him why, Hardwick often was vague and did not provide reasons.   Sometimes he said he did not receive the medication; however, records indicate that he was offered the medication and refused it. Hardwick took a total of eleven doses of risperidone over the course of four months; because the treatment was inconsistent, Dr. Jones could not determine its efficacy.

Hardwick's condition deteriorated over the course of his time at FMC Butner. Around October 2025, Hardwick's personal hygiene worsened, and he exhibited increased instances of restlessness and agitation and periods of isolation.   BOP staff reported that they often saw Hardwick pacing the halls muttering to himself, as well as periods where Hardwick would not leave his cell except at meal times.   In December 2025, Hardwick said he would not take medication.   Dr. Jones tried to meet with Hardwick to discuss medication and to educate him about the medication, but Hardwick would not participate.

9

Dr. Jones diagnosed Hardwick with schizophrenia; multiple episodes, currently in acute episode. As indicated above, schizophrenia is marked by symptoms such as hallucinations, delusions, disordered speech or behavior, and other negative symptoms such as isolation and poor hygiene. Hardwick had reported at FMC Ft. Worth that he had hallucinations and heard voices. Additionally, he presented at FMC Butner with paranoia. There are "multiple episodes" in Hardwick's case because available records and data indicate that he experienced schizophrenia symptoms on previous occasions. Hardwick is "currently in acute episode" because he is currently experiencing symptoms of schizophrenia.

According to Dr. Jones, Hardwick can regain competency with appropriate antipsychotic medication. He based his opinion on several factors: Hardwick's age, the lack of indication that medication was ineffective, and data that 75% or more of people who receive medication are restored. Additionally, in his experience, Dr. Jones has seen a high success rate in schizophrenic patients attaining competency after receiving medication. Less intrusive methods, including psychotherapy, would not be effective because schizophrenia is a medical condition in which neurotransmitters going to the brain cause delusions, which only medication can treat. Therapy cannot reduce hallucinations or delusions. Additionally, Hardwick cannot meaningfully engage in psychotherapy given his symptoms, and he historically refused to participate.

If Hardwick were forced to take medication, he would first be offered the option of a pill, but if he did not comply, the BOP would move to administering the medication by

10

injection.   Once medication is administered, psychiatry and nursing medical staff would monitor Hardwick, and his dosage would be adjusted as needed.   Hardwick would continue to receive services and be encouraged to go to groups and participate in interviews.   According to Dr. Jones, most people comply with medication requirements once there is a court order, and most patients treated with antipsychotics are restored to competency in four to eight months.

According to Dr. Jones, Hardwick does not pose a danger to himself or others while confined at FMC Butner.

**2.   Dr. Feizi**

Dr. Feizi testified at the *Sell* hearing as follows.   Dr. Feizi is a staff psychiatrist at FMC Butner.   Her job duties include treating patients in the mental health area and competency restoration.   She works with a psychologist who evaluates the patient, and she deals with medication.   She received a Doctor of Medicine degree, completed a psychiatry residency, and completed a forensic psychiatry fellowship.   She spent most of her forensic psychiatry fellowship at a state hospital working with pretrial detainees and conducting competency and insanity evaluations.   She was offered and accepted as an expert in psychiatry.

As outlined in the Addendum, Dr. Feizi developed a treatment plan of medication to treat Hardwick's schizophrenia.   According to Dr. Feizi, antipsychotic medication would likely restore Hardwick to competency because antipsychotics are the "gold standard" for treating psychotic symptoms in schizophrenia, and studies and evidence show

11

that psychotic symptoms respond to medication.   She referenced the BOP study from the Addendum in which around 76% of schizophrenia patients were restored to competency, and she confirmed that they were restored with antipsychotic medication.   Additional personal factors weigh favorably for Hardwick's response:   he is free from negative symptoms of psychosis, and he has no comorbid cognitive disorders (such as a traumatic brain injury, dementia, or intellectual disability).   Additionally, although the records are limited, available records indicate that Hardwick's disorganized thinking improved when he took antipsychotic medications previously.   She acknowledged that Hardwick's poor insight into his mental illness, the number of years his condition has been untreated, and the limited history of prior response to medication are factors that work against the effectiveness of antipsychotic medication for Hardwick.   However, she opined that the positive factors outweigh the negative factors in his case.   Dr. Feizi confirmed that schizophrenia will not abate or improve without medication, and without medication, his condition would be expected to worsen.   By contrast, antipsychotics would improve Hardwick's quality of life by reducing his symptoms and reducing hospitalizations.

Dr. Feizi also outlined her recommended treatment plan for Hardwick.   Her first recommendation is Risperdal, which Hardwick has taken in the past and to which he had some positive response.   She would first offer an oral formulation, starting at a very low dose of 1 milligram at bedtime.   Staff would monitor him, and the dosage would increase gradually as clinically indicated.   If Hardwick was unwilling to take the oral medication, she would administer a long-acting injectable formulation.   This formulation would be

injected intramuscularly every two weeks, beginning at 12.5 milligrams and then gradually increased.

Dr. Feizi also endorsed an alternative medication, paliperidone, which is a metabolite of Risperdal and in the same family. Paliperidone also comes in an oral form and a long-acting injectable form. The injectable form is given monthly.

Dr. Feizi explained that the goal is to treat the patient with one medication, but sometimes one medication has reached its potential such that an additional antipsychotic is needed. If this happened in Hardwick's case, she would recommend that halperidal be used in combination with Risperdal or paliperidone. There is no difference in efficacy between the oral form and the injectable form of the antipsychotic medications. She estimated it would take four to eight months for Hardwick to be restored to competency.

The most common side effects of antipsychotic medication are neuromuscular side effects and muscle rigidity. These side effects can be treated with another medication, and if the patient is started at a low dose of the antipsychotic and the dosage is increased slowly, there is a lesser probability of side effects. BOP staff would monitor Hardwick's side effects and could manage them. Metabolic side effects, such as weight gain and changes in blood sugar or cholesterol levels, are also possible. BOP staff would monitor Hardwick for these side effects with, for example, lipid panels and blood sugar tests. The most serious—but very rare—potential side effect is neuroleptic malignant syndrome, which occurs in only 0.01 to 0.02% of patients. Signs of neuroleptic malignant syndrome include high fever; profuse sweating; muscle rigidity; mental status changes, such as confusion,

delirium, and stupor; and autonomic instability, including rapid heartrate and fluctuating blood pressure. If Hardwick experienced neuroleptic malignant syndrome, the BOP would stop the antipsychotics and provide supportive care, including possibly muscle relaxers. The effects are generally reversible with patients recovering within a week. The risk of this syndrome is higher if the patient has underlying cardiac issues, which Hardwick has not reported. The BOP would evaluate Hardwick before starting any medication and monitor his cardiac function with an EKG.

According to Dr. Feizi, Hardwick does not pose a danger to himself or others while confined at FMC Butner.

### 3. TFO Moore

TFO Moore testified at the *Sell* hearing as follows. TFO Moore is an officer with the Montgomery Police Department and a task force officer with the ATF. He investigates major crimes involving firearms and drugs, and he is the case agent in this case. On February 24, 2024, dispatch received a call from a residence in Montgomery County regarding a lawnmower accident. When officers arrived at the residence, officers observed the victim, J.H. (Hardwick's father), lying in the foyer in a pool of blood with multiple stab wounds and a gunshot wound in the mouth. The victim was not able to stand and gurgled while speaking. The victim said that Hardwick shot him. The victim's wife also identified Hardwick as the shooter. She said the shooting occurred after an altercation in which J.H. told Hardwick to leave the residence. Officers determined there was no lawnmower accident.

14

Law enforcement later located Hardwick on US Highway 231 and took him into custody.   Hardwick stated that there was a gun in his hoodie pocket, and officers retrieved the gun from there.   TFO Moore was not sure if the gun recovered from Hardwick's hoodie pocket has been tested to "match" the gun involved in the shooting of J.H.

## IV.   DISCUSSION

Individuals possess a "significant liberty interest" under the Due Process Clause "in avoiding the unwanted administration of antipsychotic drugs." *Washington v. Harper*, 494 U.S. 210, 221–22 (1990).   In *Sell*, the United States Supreme Court addressed the circumstances in which a court may, consistent with the Due Process Clause, order involuntary medication for the sole purpose of rendering a defendant competent to stand trial.   A court may order that a defendant be involuntarily medicated to attain competency to stand trial if the following four criteria are satisfied:   (1) the government has an "important" interest in going to trial; (2) involuntary medication would "significantly further" the government's interest, which requires the court to determine two underlying facts:   whether medication is "substantially likely to render the defendant competent to stand trial," and whether medication is "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair"; (3) involuntary medication is *necessary* to further the government interest, which requires a finding that any "alternative, less intrusive treatments are unlikely to achieve substantially the same results," and that the court "consider[ed] less intrusive means for administering the drugs," such as a court order

15

backed by the power of contempt; and (4) involuntary medication is medically appropriate, "*i.e.*, in the patient's best medical interest in light of his medical condition." *Sell*, 539 U.S. at 179–83.[3]   The Eleventh Circuit has held that the second, third, and fourth criteria present factual questions which the government must prove by clear and convincing evidence, whereas the first criterion presents a legal question. *United States v. Diaz*, 630 F.3d 1314, 1331–32 (11th Cir. 2011).

The Court must therefore determine whether the Government has an "important" interesting in bringing Hardwick to trial, and whether the Government has proven the second, third, and fourth *Sell* criteria by clear and convincing evidence.   Additionally, because Hardwick has already been hospitalized at the BOP for four months for restoration treatment, the Court must relatedly determine whether he should be hospitalized "for an additional reasonable period of time until . . . his mental condition is so improved that trial may proceed." *See* 18 U.S.C. § 4241(d)(2).

**1.  First *Sell* Criterion:   Whether the Government Has an Important Interest in Prosecuting Hardwick**

"The Government's interest in bringing to trial an individual accused of a serious crime is important." *Sell*, 539 U.S. at 180.   But "[s]pecial circumstances may lessen the

---

[3] In *Sell*, the Supreme Court explained that a court faced with a request to involuntarily medicate a defendant for the purpose of restoring competency should first assess whether involuntary medication can be justified on other grounds that are "more objective and manageable," such as the purposes outlined in *Harper*, 494 U.S. at 225–26, related to the individual's dangerousness while confined, or purposes related to the individual's own interests "where refusal to take drugs puts his health gravely at risk." *Sell*, 539 U.S. at 182.   Here, Dr. Jones and Dr. Feizi testified without contradiction that Hardwick does not pose a danger to himself or others while confined.   Moreover, the record does not support the conclusion that Hardwick's refusal to take medication has put his health gravely at risk.   Consequently, the Court concludes that no other ground for involuntarily medication applies.

importance of that interest." *Id.*   For example, the potential for lengthy future confinement in an institution for the mentally ill, occasioned by a defendant's failure to take medication voluntarily, "affects, but does not totally undermine, the strength of the need for prosecution." *Id.*   The same is true if the defendant "has already been confined for a significant amount of time." *Id.*   Ultimately, determining the government's interest in prosecution is a fact-based inquiry. *Id.*

The Eleventh Circuit has not determined whether felon in possession of a firearm is, "as a general matter," a serious crime. *United States v. Fuller*, 581 F. App'x 835, 836 (11th Cir. 2014) (per curiam).[4]   In *Fuller*, an Eleventh Circuit panel determined that the charged felon in possession offense was a serious crime, thereby creating an important governmental interest in prosecuting the defendant, because a firearm was discovered at the defendant's residence during a parole officer's visit which had been triggered by the defendant's threat to harm law enforcement officers. *Id.*

Based on the evidence presented at the *Sell* hearing, in particular TFO Moore's testimony, the Court concludes that the felon-in-possession crime of which Hardwick is accused is serious.   Hardwick is alleged to have shot the victim, J.H., causing very serious injuries.   Defense counsel argues that the Court should not place much emphasis on the alleged shooting because the gun which law enforcement recovered from Hardwick apparently has not been linked to the gun from the shooting.   But regardless of whether

---

[4] Here, and elsewhere in this Opinion, the Court cites nonbinding authority.   While the Court acknowledges these cases are nonprecedential, the Court finds them persuasive.

17

the two guns are the same, the Court heard testimony that two individuals identified Hardwick as the person who shot J.H., which, if true, would also mean that Hardwick illegally possessed a firearm when he shot J.H.   For present purposes, the Court concludes that Hardwick is accused of a serious crime, and therefore the Government has a strong interest in prosecuting him.

The Government's strong interest is not overcome by Hardwick's confinement to date or by a potential lengthy future confinement.   To be sure, to date Hardwick has been in federal custody for approximately fourteen months.   But Hardwick faces a maximum of fifteen years' imprisonment, *see* 18 U.S.C. § 924(a)(8), and the Government represents that, if Hardwick were ultimately convicted (which would require that Hardwick first be restored to competency), the Government would consider requesting the statutory maximum sentence.   Therefore, Hardwick's confinement to date does not change the Court's conclusion that the Government has a strong interest in Hardwick's prosecution.

The guardian *ad litem* contends that the Government's interest is not strong because Hardwick may never be released from custody if he is later found to be dangerous and civilly committed, and also because Hardwick is facing serious charges in state court arising out of substantially the same conduct.   The guardian *ad litem* also expressed concern regarding whether Hardwick could maintain his medication regimen once he is released from the BOP medical center and presumably then detained at the Montgomery County Detention Facility.   While the Court acknowledges the guardian *ad litem*'s concerns, they are largely speculative; it is uncertain at this stage whether Hardwick would

18

be civilly committed or how the state court prosecution will proceed. In any event, the circumstances identified by the guardian *ad litem* are insufficient on this record to undermine the Court's conclusion that the Government has a strong interest in prosecuting Hardwick for the serious crime of which he is accused. Consequently, the Court finds that the first *Sell* criterion is satisfied.

### 2. Second *Sell* Criterion: Whether Involuntary Medication Would "Significantly Further" the Government's Interest

Regarding the second *Sell* criterion, the Court "must consider and determine two underlying factual questions: (1) whether medication is 'substantially likely to render the defendant competent to stand trial,' and (2) whether the medication is 'substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.'" *Diaz*, 630 F.3d at 1332 (quoting *Sell*, 539 U.S. at 181).

In *Diaz*, where the defendant suffered from paranoid schizophrenia, the court concluded that the district court did not clearly err in finding the second *Sell* criterion satisfied. *Id.* The court reasoned that two experts opined that, based on available data and "their personal experiences in treating patients similar to [the defendant]," there was a substantial likelihood the defendant would be restored to competency. *Id.* The court observed that the experts' opinions were supported by statistical studies, "which showed that between 75% and 87% of patients who were declared incompetent due to psychosis were restored to competency with the use of anti-psychotic medication." *Id.* The court

19

also found that the lack of documented history of the defendant's response to antipsychotic medication did not change the court's conclusion. *Id.* at 1333.   Regarding side effects, the court concluded that the district court did not clearly err in finding that the government showed that medication was not substantial likely to cause side effects which would impede the defendant's ability to assist counsel. *Id.*   The court observed that neuromuscular side effects, the defendant's focus, "easily can be controlled with supplemental medication" and that staff would monitor the defendant for these side effects. *Id.*   The court further observed that the proposed treatment plan provided that, if the defendant had side effects that did not respond to the adjunctive medications, his antipsychotic medication regimen will be switched. *Id.*   Additionally, in an unpublished opinion involving another defendant with paranoid schizophrenia, the Eleventh Circuit concluded that the district court did not clearly err as to the second *Sell* criterion where two doctors testified that, based on their experience and according to studies, 75 to 80% of patients who are involuntarily medicated are restored to competency. *United States v. Ruark*, 611 F. App'x 591, 598 (11th Cir. 2015) (per curiam).

 Both defense counsel and the guardian *ad litem* contend that the Government has met its burden on the second *Sell* criterion, and the Court agrees.   First, the Government has established, by clear and convincing evidence, that antipsychotic medication is "substantially likely to render [Hardwick] competent to stand trial." *See Sell*, 539 U.S. at 181.   The Court credits Dr. Feizi's testimony that antipsychotic medication would likely restore Hardwick to competency because antipsychotics are the "gold standard" for treating

20

psychotic symptoms in schizophrenia, and studies and evidence show that psychotic symptoms respond to medication. Additionally, a BOP study found that 76% of schizophrenia patients were restored to competency with antipsychotic medication. *See Diaz*, 630 F.3d at 1332; *Ruark*, 611 F. App'x at 598. The Court also credits Dr. Feizi's testimony that Hardwick's positive factors—he is free from negative symptoms of psychosis, he has no comorbid cognitive disorders, and he has had positive (albeit limited) response to antipsychotic medication previously—outweigh the negative factors in evaluating whether antipsychotic medication will restore him to competency. Dr. Jones similarly testified that, based on available data and evidence, schizophrenia patients treated with antipsychotic medication attain competency over 75% of the time; and that based on his personal experience, antipsychotic medication has a high rate of success.

Additionally, the Court finds that, on this record, the proposed medication is "substantially unlikely to have side effects that will interfere significantly with [Hardwick's] ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *See Diaz*, 630 F.3d at 1332 (quoting *Sell*, 539 U.S. at 181). In both the Addendum and in her testimony, Dr. Feizi explained that the BOP will monitor and manage any potential sides effects, in particular the more common neuromuscular side effects. The BOP will manage side effects by providing additional medication to treat the symptoms, lowering the dose of the antipsychotic medication, switching the antipsychotic medication, or a combination. All told, the record supports the conclusion, by clear and convincing evidence, that the proposed medication regimen is substantially unlikely to

21

have side effects that significantly interfere with Hardwick's ability to assist in his own defense. *See Diaz*, 630 F.3d at 1333. For these reasons, the Court finds that the Government has shown, by clear and convincing evidence, that involuntary medication would "significantly further" the Government's interest.

### 3. Third *Sell* Criterion: Whether Involuntary Medication is Necessary to Further the Government's Interest

Regarding the third *Sell* criterion, the Court must find that any "alternative, less intrusive treatments are unlikely to achieve substantially the same results," and it must also "'consider less intrusive means for administering the drugs,' such as a court order backed by the power of contempt, before considering more intrusive methods." *Diaz*, 630 F.3d at 1334–35 (quoting *Sell*, 539 U.S. at 181).

In *Diaz*, the court concluded that the district court did not err in finding the third *Sell* criterion satisfied. *Id.* at 1335. The court rejected the defendant's argument that the government should have first pursued the less-intrusive alternative of convincing him to take his medication voluntarily by making a "serious effort" to develop a relationship between him and his therapist, noting that the defendant had refused medication and other forms of treatment numerous times over the course of a year. *Id.* Additionally, experts testified that psychotherapy, including one-on-one conversations between a patient and his therapist, is not effective to treat schizophrenia without medication because schizophrenia is caused by a biological condition. *Id.* Another doctor opined that treating the defendant with psychotherapy would be futile. *Id.* The court also observed that medical center staff

22

would show the defendant a copy of the court's medication order and ask him to comply with it before injecting him with any medication. *Id.*  Moreover, if the defendant became cooperative during the course of treatment, staff would switch from injecting his medication to allowing him to take it orally. *Id.*  Similarly, the court in *Ruark* concluded that the district court did not err as to the third *Sell* criterion where doctors stated that paranoid schizophrenia "has a strong biological basis"; the defendant was unlikely to recover without medication; and the variety of nonmedication alternatives, including the competency restoration group, counseling, and psychotherapy, would be ineffective because of the defendant's paranoia. 611 F. App'x at 599.

The Court concludes that the Government has shown, by clear and convincing evidence, that any "alternative, less intrusive treatments are unlikely to achieve substantially the same results" as antipsychotic medication. *See Diaz*, 630 F.3d at 1334–35 (quoting *Sell*, 539 U.S. at 181).  The Court credits Dr. Jones' testimony that less intrusive methods, such as psychotherapy, would not be effective in restoring Hardwick to competency because schizophrenia is a medical condition which only medication can treat. Dr. Jones explained that therapy cannot reduce hallucinations or delusions, and Dr. Feizi similarly testified that Hardwick's schizophrenia will not cease or improve without medication.  Additionally, Dr. Jones opined that Hardwick cannot meaningfully engage in psychotherapy given his symptoms, and he historically refused to participate despite Dr. Jones' encouragement.  Defense counsel argues that the Government has not satisfied its burden under the third *Sell* criterion because the Government did not offer evidence of any

other less intrusive methods to restore Hardwick's competency other than medication. The Court disagrees.   As just outlined, Dr. Jones and Dr. Feizi both testified that medication is necessary to treat Hardwick's symptoms, and that other, less intrusive methods are insufficient.

The Court has also considered less intrusive means for administering the antipsychotic medication.   The Court credits Dr. Jones' and Dr. Feizi's testimonies that, if the Court ordered involuntarily medication, they would first show Hardwick the court order and give Hardwick the opportunity to take the medication orally.   According to Dr. Jones, most people voluntarily take the medication once the court orders it.   Only if Hardwick refuses oral medication would the BOP forcibly inject him.   The Court thus will require the BOP to pursue this less intrusive method—showing Hardwick the order and attempting to achieve his cooperation in taking oral medication—before permitting the BOP to undertake the more intrusive approach of forcible injection.   However, the Court leaves it to the BOP's medical judgment to determine when efforts to achieve Hardwick's cooperation have failed and therefore forcible injection has become necessary.

For these reasons, the Court concludes that the third *Sell* criterion is satisfied.

### 4. Fourth *Sell* Criterion:   Whether Involuntary Medication is Medically Appropriate

Regarding the fourth *Sell* criterion, the Court must determine whether involuntary medication is medically appropriate, "*i.e.*, in the patient's best medical interest in light of his medical condition." *Sell*, 539 U.S. at 179–83.   The Court concludes that the

Government has shown, by clear and convincing evidence, that antipsychotic medication is medically appropriate for Hardwick. According to Dr. Feizi's Addendum, antipsychotic medication is "the primary and standard treatment for patients with schizophrenia." (Doc. 67 at 6). Additionally, the American Psychiatric Association Practice Guidelines recommend antipsychotic medications based on supportive research evidence. Similarly, Dr. Feizi testified that antipsychotic medication is the "gold standard" for treating psychotic symptoms in schizophrenia, and that such medication would improve Hardwick's quality of life by reducing his symptoms and reducing hospitalizations. Consequently, the Court concludes that the fourth *Sell* criterion is satisfied.

Because the Court concludes that all four *Sell* criteria are satisfied, the Court will grant the Government's request and order that Hardwick be involuntarily medicated. Additionally, the Court finds that Hardwick should be hospitalized "for an additional reasonable period of time until . . . his mental condition is so improved that trial may proceed." *See* 18 U.S.C. § 4241(d)(2). Based on the evidence presented, the Court finds that "there is a substantial probability that within such additional period of time"— specifically, eight months—"[Hardwick] will attain the capacity to permit the proceedings to go forward." *See id.* The Court further finds that eight months from the date of the Court's Order is a reasonable period of time. Further, the Court will require the BOP to submit periodic status reports every two months and to notify the Court and counsel if the BOP determines that Hardwick has been restored to competency before the end of the

eight-month period.

## V.   CONCLUSION

Accordingly, and for good cause, it is

ORDERED as follows:

1.     The Government's request that the Court order the involuntarily medication of Defendant Khalfani Ahmed Hardwick is GRANTED;

2.      Pursuant to 18 U.S.C. § 4241(d)(2), Hardwick shall remain in the custody of the Attorney General for an additional period **up to and including November 27, 2026**, to determine whether Hardwick's mental condition is so improved that trial may proceed;

3.     The BOP shall treat Hardwick as outlined in the testimony of Dr. Feizi at the *Sell* hearing and in her Addendum, as discussed above.   The treatment protocol shall begin with encouragement that Hardwick agree to take oral medication voluntarily;

4.     If after a reasonable time as determined by BOP medical staff, or after treatment has begun, Hardwick refuses to comply voluntarily, the BOP is authorized to administer the involuntary regimen of injectable medication proposed by Dr. Feizi in the Addendum and in her testimony at the *Sell* hearing;

5.     The BOP shall submit to the Court and to counsel[5] periodic status reports **every two months**, beginning on **May 26, 2026**, regarding the efforts to restore Hardwick to competency and his response to the medication;

---

[5] The Court's references to "counsel" in paragraphs 5, 6, and 7 of this Section include counsel for the Government, counsel for the Defendant, and the guardian *ad litem*.

26

6.     The BOP shall submit to the Court and to counsel its final report regarding Hardwick's restoration to competency **no later than December 11, 2026**;

7.     If, at any time prior to November 27, 2026, it is determined that Hardwick's mental condition is so improved that trial may proceed, the BOP shall notify the Court and counsel as soon as practicable, and the BOP shall submit its report to the Court and to counsel as soon as practicable but **no later than fourteen days after the determination is made.**

8.     **The BOP is DIRECTED to submit its reports and notices to the Court by U.S. mail and also by email to:   markschambers@almd.uscourts.gov**.

The Clerk of the Court is DIRECTED to send a copy of this Order to the Warden of FMC Butner by mail and via email to s1burroughs@bop.gov.

DONE this 26th day of March, 2026.

/s/ Emily C. Marks
EMILY C. MARKS
UNITED STATES DISTRICT JUDGE
